## AMERICAN INDEMNITY CO. v. DINKINS. (No. 449.)

(Court of Civil Appeals of Texas. Beaumont. April 15, 1919. Additional Findings of Fact, April 30, 1919.)

**1. MASTER AND SERVANT ☞375(2)—WORKMEN'S COMPENSATION—"COURSE OF EMPLOYMENT."**

Petition alleging that deceased, employed as an electric engineer, registered out for the day at the entrance gate, and started for home to secure rest, and had gotten a short distance, when he was struck by an automobile, was demurrable because it showed that injury was not sustained in the "course of employment," within Employers' Liability and Workmen's Com-

pensation Law, pt. 1, as that term is defined by section 1, pt. 2.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Course of Employment.]

**2. MASTER AND SERVANT ☞348—WORKMEN'S COMPENSATION LAW—INSTRUCTIONS.**

The terms of the Employers' Liability and Workmen's Compensation Law should be construed with the utmost liberality of which they are legally capable.

**3. MASTER AND SERVANT ☞375(2) — WORKMEN'S COMPENSATION—"COURSE OF EMPLOYMENT."**

Injuries sustained by deceased, three-quarters of a mile from refinery where he was employed as electric engineer, after he had registered out for the day and started for home to secure rest, did not occur while he was engaged in the furtherance of the affairs of his employer, within Employers' Liability and Workmen's Compensation Law, pt. 2, § 1, defining the phrase "injury sustained in the course of employment."

**4. MASTER AND SERVANT ☞402—WORKMEN'S COMPENSATION—REFUSAL TO FIND UNDISPUTED FACTS.**

In suit under Employers' Liability and Workmen's Compensation Law, held, under the undisputed evidence, that court erred in refusing to find as a fact that employé was injured after he had punched the time clock and after he had been relieved for the working day.

**5. MASTER AND SERVANT ☞402—WORKMEN'S COMPENSATION—REFUSAL TO FIND UNDISPUTED FACTS.**

In suit under Employers' Liability and Workmen's Compensation Law, held, under the undisputed evidence, that court erred in refusing to find that the injury occurred on one of the main public roads, which was not the only road leading to and from the plant of the employer.

**6. MASTER AND SERVANT ☞402—WORKMEN'S COMPENSATION—BURDEN OF PROOF.**

Parties who base their right of recovery on the Workmen's Compensation Law must show that they are entitled to compensation within the terms of the act, in view of part 2, § 5, providing that the rights and liabilities of parties shall be determined by the provisions of the act.

**7. MASTER AND SERVANT ☞371—WORKMEN'S COMPENSATION — INJURY RECEIVED IN THE "COURSE OF EMPLOYMENT."**

To come within the term "injury received in the course of employment," as defined by Workmen's Compensation Law, pt. 2, § 1, it must be shown that the injury originated in the work, and, further, that it was received by the employé while engaged in the furtherance of the affairs of the employer.

**8. MASTER AND SERVANT ☞375(1)—WORKMEN'S COMPENSATION — RELATION OF EMPLOYER AND EMPLOYÉ—TERMINATION.**

Although an employé's employment may continue for an interval after he has ceased

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

working, there must be a line beyond which the liability of the employer cannot continue, and the question where that line is· to be drawn in each case is to be determined by the facts themselves.

Appeal from District Court, Jefferson County; A. E. McDowell, Judge.

Suit by Mrs. A. P. Dinkins, for herself and as next friend for her two minor children, Jack Dinkins and Emma Marie Dinkins, against the American Indemnity Company, to recover compensation under Employers' Liability and Workmen's Compensation Law. Judgment for plaintiffs, and defendant appeals. Reversed, and judgment rendered for appellant.

Minor & Minor and Sam C. Lipscomb, all of Beaumont, for appellant.

Jas. A. Harrison, of Beaumont, for appellees.

BROOKE, J. This suit was instituted by Mrs. A. P. Dinkins for herself and as next friend for her two· minor children, Jack Dinkins and Emma Marie Dinkins, against the American Indemnity Company to recover workmen's compensation under the provisions of the Employers' Liability and Workmen's Compensation Law of the State of Texas, as embodied in chapter 103, p. 269, General Laws of 1917 (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91).

Plaintiffs alleged that the defendant issued a policy of insurance to the Magnolia Petroleum Company, insuring employés working at the Magnolia refinery at Beaumont against injuries resulting in death and received and sustained in the course of employment, and that the policy so issued was to insure the liability and pay the compensation provided for in said Employers' Liability and Compensation Act; that the Magnolia Petroleum Company employed more than 1,500 persons, and had insured its employés with the defendant, American Indemnity Company; that A. P. Dinkins on September 30, 1917, was an employé of the Magnolia Petroleum Company as an electrical engineer at its refinery at Beaumont, Tex., and had been continuously in the service of said Magnolia Petroleum Company in such capacity for several years; his duties required him to work until 12 o'clock at night, at which time he would leave the refinery, go to his home for rest and refreshment, and return the next day to continue his duties; that the Magnolia Petroleum Company, as above said, employed about 1,500 men at said refinery, and worked same in shifts, making three shifts every 24 hours; that when the men in one shift would be going out, the men in the next shift would be coming in, and these employés met and passed each other in coming in and going out of the refinery; that the re-

finery was inclosed, and all employés were required to enter and leave the refinery at the big entrance gate, where a watchman was stationed, who let them in and out, and where the employés punched in as they entered and punched out as they left the refinery; that the road to the refinery was laid out and built by Jefferson county at the instance of the owners of the refinery, and that the Magnolia Petroleum Company, in addition to its tax for road and bridge purposes, contributed both material and labor in the construction of said road; that said road is the only paved or shelled road leading to the refinery, and was the road used exclusively by its employés, who ride in and on automobiles, bicycles, and motorcycles, and is the road provided and maintained by the Magnolia Petroleum Company for the use of its employés going to and coming from their work at the refinery; that in going to and coming from their work the employés met and passed each other in great numbers, and that employés, especially those changing shifts at 12 o'clock at night, were subjected to dangers in using said road not applicable to the general public at large.

It is further alleged that on September 20th, at about 12 o'clock at night, A. P. Dinkins, deceased, punched out for the day at the refinery gate, as he was required to do, got on his motorcycle, and started for home to secure needed rest and refreshment, so he could pursue his labors the next day, and was riding on and along said paved road, and had gotten a short distance from the refinery gate, when he was struck by an automobile traveling on said road, and sustained injuries which resulted in death; that the automobile which struck Dinkins was being driven by Frank Ellis, an employé of the Magnolia Petroleum Company, who was on his way to work; that plaintiffs are the sole and exclusive beneficiaries of A. P. Dinkins, deceased. Plaintiffs further alleged that the Industrial Accident Board of Texas, upon application of plaintiffs for compensation under said act, fully acquitted 'and discharged the defendant from all liability on account of the death of A. P. Dinkins, and this suit was filed May 13, 1918, to set aside the award for said Industrial Accident Board and to recover the compensation provided for in the act.

To plaintiffs' petition the defendant filed a general demurrer and special exceptions and a general denial. By special answer defendant admitted that it was insurer for the Magnolia Petroleum Company, but alleged that A. P. Dinkins was not engaged in any work or employment for the Magnolia Petroleum Company at the time of his injury, and that the said Dinkins was not under the control and was not performing any service for his employer at the time of the injury, and that said injury did not have to do with, nor originate in, the work or busi-

ness of his employer, and was not received by said Dinkins while engaged in or about the furtherance of the affairs of his employer; that said Dinkins was on a mission of his own, and far removed from his place of employment, when said injury occurred; and specially denied that the road or street upon which Dinkins was injured was in any way controlled by the Magnolia Petroleum Company; and denied, further, that the road at that point where Dinkins was injured was provided and maintained by the Magnolia Petroleum Company for the use of its employés; and further denied that the employés of Magnolia Petroleum Company were required to use said road or any other particular road in going to and coming from work, but that, on the other hand, said employés were free to choose any one of several highways of travel in going to and coming from said refinery. Defendant further specially denied that the terminus of said road was at the gate of the Magnolia Petroleum Company, and alleged that the place of injury was one-half mile west of the refinery, on a street within the corporate limits of Beaumont, Tex., and that said road constituted a part of one of the main highways from Beaumont to Orange, Tex.

Judgment was rendered August 5, 1918, in favor of plaintiffs for $4,800; motion for a new trial was filed August 6, 1918; and amended motion for new trial was filed September 4, 1918, and in the order overruling same defendant was granted 90 days after adjournment of the term within which to prepare and file a statement of facts and bills of exception. The term at which this case was tried expired September 28, 1918; transcript and statement of facts were filed December 4, 1918, and this cause is properly before the court for review.

[1] In the first assignment of error it is complained that the trial court erred in overruling defendant's general demurrer in its original petition. Under this assignment there is a proposition to the effect that—

"The petition shows on its face that Dinkins did not sustain his injury in the course of employment, but, on the other hand, it affirmatively shows that he was injured after he had severed his relation of employé."

We quote from plaintiffs' original petition as follows:

"On or about September 30, 1917, at about 12 o'clock at night, A. P. Dinkins, deceased, punched out for the day at the refinery gate, as he was required to do, got on his motorcycle, and started for home to secure needed rest and refreshment, so he could pursue his labors the next day, and was riding on and along said paved road, and had gotten a short distance from the refinery gate, when he was struck by an automobile traveling on said road."

Further, in paragraph 5, plaintiffs allege that "the said Dinkins was an employé of the Magnolia Petroleum Company as an electrical engineer"; thus excluding the idea that his duties as an employé required him to go outside of the plant for any part of the work.

Section 1, part 1, of the Employers' Liability and Workmen's Compensation Law of 1917, provides for compensation to be paid by the insurer for "injuries sustained in the course of employment"; and section 1, part 2, of the Act, p. 292, defines the phrase, "injury sustained in the course of employment," as follows:

"The term 'injury sustained in the course of employment,' as used in this act, shall not include:

"(1) An injury caused by the act of God," etc.

"(2) An injury caused by an act of a third person intended to injure the employé because of reasons personal to him," etc.

"(3) An injury received while in a state of intoxication.

"(4) An injury caused by the employé's willful intention and attempt to injure himself, or to unlawfully injure some other person, but shall include all other injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employé while engaged in or about the furtherance of the affairs or business of his employer, whether upon the employer's premises or elsewhere." General Laws 1917, p. 292.

The main question in this case is whether or not Dinkins sustained injuries in the "course of employment," as that term is defined in the Texas Employers' Liability Act.

[2] We are of the opinion that it is the duty of this court to give to the terms of the act the utmost liberality of which they are legally capable, to the end that the beneficent purposes of the act may be effectuated. However, we must remember that the purpose of the Workmen's Compensation Law, as set out in the preamble of the act, was to make more certain the recovery of compensation for injuries to employés in cases where an action would ordinarily exist at common law, to the exclusion, among other things, of the doctrine of assumed risk. An eminent authority calls such legislation as the Workmen's Compensation Law an attempt at "justice without law," and for this reason we are of the opinion that, since the common-law rules of liability have been abrogated in cases of this nature, there is all the greater reason that the court should endeavor to follow the spirit of the statute.

The Texas Legislature, unlike the Legislatures of other states, has incorporated in the act certain definitions which must be taken into consideration when applying the provisions of the law to an established set of facts. It defines by plain and unmistakable terms the words "injury received in the course of employment," by stipulating that

the phrase shall include "all other injuries of every kind and character having to do with, and originating in the work, trade, business or profession of the employer, received by the employé while engaged in or about the furtherance of the affairs or business of his employer, whether upon the employer's premises or elsewhere."

This record shows that Dinkins did not receive the injury while engaged in or about the furtherance of the affairs of the Magnolia Petroleum Company, but, on the other hand, it plainly shows that he was bent on his own rest and refreshment, and that at the time of the injury the employer was exercising no control whatever over him; and, in addition to this, the petition shows clearly that the injury did not originate in the work. It was an injury that might happen to any person on any street, regardless of his employment.

We have been unable to find any language in the laws of other states, similar to the language quoted, which defines what shall be regarded as an "injury received in the course of employment.'" The Legislature of Texas did not intend to adopt the judicial construction placed upon the terms of the acts by the other states, and this is proved by the fact that there is incorporated in the Texas act a definition of that term.

As said by a learned judge in the case of Ocean Accident & Guaranty Co. v. The Industrial Accident Commission, 173 Cal. 317, 159 Pac. 1042, L. R. A. 1917B, 336:

"Under familiar principles, when a statute which has received judicial construction by the courts of one state is adopted and re-enacted by another state, it is so adopted and re-enacted in consonance with the construction put upon it by the courts of the first sovereignty. The common sense of this rule of construction is so apparent that it needs in its support nothing more than the obvious suggestion that, if the later lawmakers did not design that the construction put upon any given language should obtain, they would modify and change that language to express their different intent."

The Texas Legislature has seen fit to modify the language of our compensation act by defining what shall be regarded as "an injury received in the course of employment" by defining it as one which must "originate in the work," and in addition be received by the employé "while engaged in or about the furtherance of the affairs or business of his employer, whether upon the employer's premises or elsewhere."

In our opinion, the decisions of other states are not of great service in construing the Texas Workmen's Compensation Act. But it may be well to show the general trend of authorities. In the case of Federal Rubber Co. v. Havolic, 162 Wis. 341, 156 N. W. 143, L. R. A. 1916D, 968, the following language is used:

"The causative danger must be peculiar to the work, and not common to the neighborhood. It must be incidental to the character of the business, and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence."

The above-quoted language was used by the court in dealing with the construction to be given to the language "arising out of and in the course of employment," without the aid of a definition as provided for in the Texas act, and, as seen from the quoted passage above, by attempting to modify the language by defining it, it clearly appears that the spirit of the Texas law requires that the employé must be actually about the furtherance of his master's business when the casualty occurs; otherwise it will be regarded simply as one of those unhappy accidents such as might happen to any of us, and the responsibility for which cannot be laid at the door of the employer.

Was the injury sustained by Dinkins one which originated in the work of his employer, and was it also sustained while he was engaged in or about the furtherance of the affairs of his employer? If so, then what business of his employer was he performing? If one is proceeding to his home for needed rest and refreshment, can he be regarded as engaged in the furtherance of the affairs or business of his employer? If so, then by parity of reasoning the act should be construed to cover injuries received by an employé while he is on his vacation. It is plain that Dinkins sustained his injury after he had abandoned his duties which involved the furtherance of the affairs of the employer.

Nearly all the authorities which we have been able to find are those dealing with laws which provide for compensation when the injury sustained "arises out of and in the course of employment"; and we believe these words are more comprehensive and there is more latitude for construction than is permitted by the definition in the Texas act, as note the following quotation from Honnold on Workmen's Compensation, p. 320:

"According to the usual language of the acts, to warrant recovery of compensation for the injury or death of a workman, the injury must be one 'arising out of and in the course' of his employment. The phrase is used in the same sense in the acts of England and of many of the states, and, though its literary construction is well settled, its application to particular cases has given rise to differences of opinion not easily harmonized. Attempts of the courts to formulate general rules relative to the distinction between the terms 'out of' and in the 'course of' have not been entirely successful. All agree, however, that the terms are not intended to be synonymous. An injury may be received in the course of employment and still have no casual connection with it so that it can be said to arise out of the employment." Brew-

ing Co. v. Dist. Ct., 129 Minn. 176, 151 N. W. 912. "But it is difficult, if not impossible, to conceive of an injury arising out of, and not also in the course of, the employment.

"Many accidents occur in the course of, but not out of, the employment; but I am unable to think of any that could arise out of, and not also in the course of, the employment." Farwell J. N. Leach v. Oakley, etc., Co., 4 B. W. C. C. 98.

"I think it is impossible to have an accident arise out of [the employment] which is not also in the course of the employment; but the converse of this is quite possible, as, for instance, if a workman were shot by a lunatic, or struck by lightning, while at the moment engaged in his work. In a great many cases, however, the two phrases do not admit of separate consideration, and the present is one of these cases. If this accident took place in the course of the workman's employment, it also indubitably arose out of that employment. If not, not." McLauchlan v. Anderson, 4 B. W. C. C. 379.

"The importance of distinguishing between these terms arises from the fact that each represents an element essential to, but not authorizing, recovery of compensation without the presence of the element represented by the other. In other words, even though the injury occurred in the course of the employment, if it did not arise out of the employment there can be no recovery; and, even though it arose out of the employment, if it did not arise 'in the course of the employment' there can be no recovery.

"The words 'out of' point to the origin and cause of the accident or injury; the words 'in the course of' to the time, place, and circumstances under which the accident or injury takes place. The former words are descriptive of the character or quality of the accident. The latter words relate to the circumstances under which an accident of that character or quality takes place. The character or quality of the accident, as conveyed by the words 'out of,' involves the idea that the accident is in some sense due to the employment. It must result from a risk reasonably incident to the employment." Bryant v. Fissel [84 N. J. Law, 72], 86 Atl. 458.

Mr. Honnold, at page 353, says:

"The term of employment is not necessarily identical with the time during which services are being performed for the employer. But where, by the terms of the employment, an employé is to be ready at any hour of the day or night to perform certain duties, it does not follow that any accidental injury which he may receive during the course of the 24 hours is compensable. To have all the requisites for compensation present, it is essential that he be, in fact, discharging some duty in the course of the employment. The term of employment includes time spent in traveling on the employer's business, and a reasonable latitude of acts not in furtherance of the business, but done during working time."

On page 346 he further says:

"It is essential to the right to compensation that the injury shall have been received in the course of the workman's employment; that it shall have been received while he was doing some act reasonably incident to his work. An accident or injury is so received when it occurs when he is doing what a man in like employment may reasonably do within a time during which he is so employed, and at a place where he may reasonably be during that time. 'Course of employment' includes acts in which the employer has acquiesced, though they are not done in a strict performance of the employé's duties."

In the McNicols Case, 215 Mass. 497, 102 N. E. 697, L. R. A. 1916A, 306, the question was whether the deceased received an "injury arising out of and in the course of his employment," within the meaning of the act. The court said:

"In order that there may be recovery, the injury must both arise out of and also be received in the course of employment. Neither alone is enough. * * * It is sufficient to say that an injury is received 'in the course of' the employment when it comes while the workman is doing the duty which he is employed to perform. It arises 'out of' the employment when there is apparent to the rational mind * * * a causal connection between the conditions under which the work is required to be performed and the resulting injury. * * * But it excludes an injury which cannot fairly be traced to the employment as a contributing proximate cause and which comes from a hazard to which the workman would have been equally exposed apart from the employment. The causative danger must be peculiar to the work, and not common to the neighborhood. It must be incidental to the character of the business, and not independent of the relation of master and servant. It need not have been foreseen or expected, but after the event it must appear to have had its origin in a risk connected with the employment, and to have flowed from that source as a rational consequence."

In the case of Ocean Accident & Guaranty Co. v. Industrial Accident Board, supra, a California case, the court says:

"In Walters v. Stavely Coal & Iron Co., Ltd., 4 B. W. C. C. 303, a miner was proceeding to his work along a footpath prepared by his employers for their workmen's convenience. He slipped and sustained injury. There was evidence that the employers knew that the footpath was not safe. The question considered by the House of Lords was: Did the accident 'arise out of the employment, and did it arise in the course of the employment'? It was held that there was 'no evidence which would have justified a finding that the accident arose out of the employment,' and it was declared to be immaterial that the employé was injured upon this footpath prepared for his use by his employers, 'since the man was merely going to his employment.' * * *

"In the very broadest sense, of course, it is true that an injury which happens to a man who is on his way to his place of employment is an injury 'growing out of and incidental to his employment,' since a necessary part of the employment is that the employé shall go to and return from his place of labor. But it is to be noted that the right to an award is not founded upon the fact that the injury grows out of and is incidental to his employment. It

is founded upon the fact that the service he is rendering at the time of the injury grows out of and is incidental to the employment. Therefore an employé going to and from his place of employment is not rendering any service, and begins to render such service only when, as has been said, arriving at the place of his employment, he proceeds to use some instrumentality provided, by means of which he immediately places himself in a position to perform his tasks."

This authority further says:

"With these authorities before us, we think the governing principles of all the decisions are not difficult of discernment. The first of these is that there are excluded from the benefits of the act all those accidental injuries which occur while the employé is going to or returning from his work, and it matters not in this respect whether his journey takes him over public roads or private ways."

These quotations from the above cases are only argumentative, and cannot be regarded as authoritative on the point at issue in this case, but they have their weight as indicating what was probably the intention of the lawmakers in enacting the Workmen's Compensation Law of the several other states.

We have given our best consideration to the proposition before us. We have utilized all the time that we could give to this difficult and perplexing proposition. We have arrived at the conclusion that the court should have sustained the demurrer, and that it was error not to do so.

[3] The second assignment complains that the trial court erred in rendering judgment against defendant because the evidence showed conclusively that the injury did not originate in the work, and it did not occur while the said A. P. Dinkins was engaged in or about the furtherance of the affairs or business of the Magnolia Petroleum Company; and the proposition is that plaintiffs were not entitled to recover because the undisputed evidence showed that the injury did not occur while Dinkins was engaged in or about the furtherance of the affairs of his employer, and the injury therefore did not come within the terms of the compensation act.

It is useless for us to set out the testimony that was adduced upon the trial of this case. It will be sufficient to say that it was proven by one O. C. Wonder that he worked in and around the same place with Mr. Dinkins.

"In fact, I worked with him, and am the man that relieved Mr. Dinkins. My customary road that I used in going to the refinery was Madison avenue road. Will state that it was my custom to be at the refinery at least 10 minutes of the time for me to go on, and I relieved Mr. Dinkins. I relieved him on the night he was killed. It is a rule out there to relieve the man when you get there; it don't make any difference if it is between 11 and 12 o'clock. Whenever a relief man comes on he goes and gets ready for work and relieves the man. The man that he relieves is free to do whatever he wants to after he punches out at the gate. Some of the men don't have to change their working clothes to work. Yes, sir; I have worked on the shift from 12 to 8 in the morning. At 12 o'clock a man by the name of H. T. Robins relieves me—at 12 o'clock; that is, he is one of the relief men that relieves me. When I finish my work and am relieved I always go home; I go to the big gate, however, first, and punch out, before I leave for home. It is between three and five hundred feet from the place where I work to the gate where we punch out."

He also testified:

"I work by the hour. My time stops when I leave the refinery. Yes, sir; I do the same kind of work Mr. Dinkins does. I have never performed any duties for the Magnolia Petroleum Company outside of the yards. I do not consider myself an employé of the company after I leave the gate. My time stops. The company does not have any control over me after I leave the refinery gate until I get back the next day. * * * I work eight hours a day. The night that Mr. Dinkins was killed I think I relieved him about ten minutes to twelve, and I think he left just as soon as I relieved him; and I believe it was 12:25 when Mr. Jones come up and told me that Mr. Dinkins had been killed."

Courtenay Marshall, witness for defendant, testified that when a man was relieved from his customary and ordinary work at the refinery his employers no longer exercised any control over him whatever.

The court found in this case that Dinkins was operating his motorcycle on a public street at night, without a light, which was in violation of law, and consequently an unreasonable way. Dinkins could not, therefore, have recovered under the rules laid down by the statutes of other states, and this would be an additional reason why the decisions of other states are not to be regarded as binding authority in this state.

It is our opinion it was not the intention of the Texas lawmaking body to include an injury such as the one under consideration. There was no relation of master and servant at the time. There was no duty on the part of any one to see that Dinkins reached his home in safety. If a person should be regarded as performing a service for his master, when he goes home to rest, then why should he not be regarded as furthering his employer's business while he is eating his food; and, on this theory, should he be injured, why should he not be able to recover? We are of opinion that the court erred, as complained of, in rendering judgment against the defendant, and this assignment is in all things sustained. Walters v. Stavly Coal & Iron Co., 4 B. W. C. C. 303; Leverone v. Travelers' Ins. Co., 219 Mass. 488, 107 N. E. 349; Ocean Accident & Guaranty Co. v. Industrial Accident Board, 173 Cal. 313, 159 Pac. 1044, L. R. A. 1917B, 336.

The third assignment complains that the court erred in rendering judgment against the defendant because the undisputed evidence shows that the said A. P. Dinkins was not engaged in or about the furtherance of the affairs or business of his employer at the time of the injury herein complained of, and because said injury occurred at a time when the said A. P. Dinkins was on a mission of his own, and at a time when the relation of master and servant did not exist, and the injury cannot, as a matter of law, be regarded as within the purview of the Workmen's Compensation Act.

The proposition under this assignment is that the Employers' Liability and Workmen's Compensation Law is not intended to cover injuries received by an employé while he is not engaged in or about his duties as an employé.

Having passed on the assignments heretofore, it is needless for us to add anything with reference to this assignment, and we, therefore, without further comment, sustain the assignment.

[4] The fourth assignment of error complains that the court erred in refusing to find as a fact that A. P. Dinkins was injured after he had punched the time clock and after he had been relieved for the working day of September 30, 1917, same being finding No. 3, requested by the defendant.

The appellant requested the trial court to find the facts as set out in the fourth assignment of error. The court refused the request and appellant excepted. The court found:

"All employés at the refinery were required to enter and leave the refinery at the big entrance gate where a watchman is stationed, to let them in and out. There is only one road to the refinery of the Magnolia Petroleum Company; this road leaves the Beaumont-Port Arthur road at Madison street and extends along Madison street, Grove street, and Burt avenue, and to the refinery's entrance gate. This road is graded up and paved, and, in addition to regular taxes, the Magnolia Petroleum Company contributed both labor and material at its own expense in the construction of this paved road. This is the only road leading to the refinery which is fit or suitable for automobiles, motorcycles, bicycles, and other vehicles, and is the road used exclusively by all the employés of the Magnolia Petroleum Company who go to and from their work in automobiles and other vehicles. Frank Ellis, also an employé of the Magnolia Petroleum Company, was on the shift which began work at 12 o'clock that night. He was traveling said road in his automobile to report for work, and A. P. Dinkins, who had just quit work, was riding home on his motorcycle along said road without lights on his motorcycle; Dinkins going the most direct, and only suitable, route home for needed rest and refreshment, and Ellis coming in to work, when the car of Ellis collided with the motorcycle of Dinkins, producing injuries which resulted in the death of Dinkins the same night. This collision occurred on Madison avenue, between Brooklyn and Irving streets, and about two minutes after Dinkins had left the refinery gate. I find as a fact that said road being the only road that could be used by the employés of the Magnolia Petroleum Company living in the city of Beaumont, going to and returning from their work, that the Magnolia Petroleum Company not only tacitly invited them to use said road, but practically required them to do so, and that employés at such refinery, while going in and out from work on said road, were subjected to the same danger of collisions and injury with each other as within the refinery grounds, and that the place where A. P. Dinkins was run over and killed by Frank Ellis was within the danger and hazard zone of the refinery."

C. F. Scruggs testified for plaintiffs as follows:

"At the present I am employed down there (at Magnolia refinery) as 'shift foreman.' I have charge of one eight-hour shift. On the night of September 30, 1917, I held the same position with that company as I do now. When I say 'shift foreman' I mean that I am foreman of the men working for my department during the hours that I work; I look after them during the eight hours they work. During the month of September they had three shifts: they were from 12 at night to eight in the morning, from eight in the morning until four in the afternoon, and from four in the afternoon until 12 at night. There is three shifts of eight hours each. During the month of September there was between three hundred and four hundred men employed on shift work; that is, there would be something like one hundred on a shift. In my judgment there was between twelve hundred to fifteen hundrd men employed by the Magnolia Petroleum Company during the month of September, 1917. Mr. Dinkins was supposed to leave at 12 o'clock on the night of September 30, 1917. His relief man was supposed to relieve him at 12 o'clock, possibly a few minutes beforehand. When a man went off of the shift—quit his work for the day—he went to the general main entrance to get out. The gate was not locked, but was watched by a watchman, and when he got to the gate going out he had to register. There is a clock there and he had to punch out."

He further testified that Dinkins' duties were to operate the engine that furnishes the light for the yards and for the water pump and such like that. Continuing, he testified:

"Just as soon as the men punch out at the gate they are free to go where they please. They could go down any of those roads they wanted to, or they could take the car—that would be up to them; there is no restriction whatever."

And further:

"Q. What was the rule of you foremen about one man leaving before the other had changed his clothes and announced ready for work? Answer: Of course my orders come from the office, and they instructed me to have them change their clothes and come and report, and the man that they relieved turned the work over to him, and he wasn't permitted to change his clothes until after his relief man came and

accepted his job. He had to wait until the relief man came and told him that he was ready to take the job over, and after that he was permitted to go and change his clothes, wash up, and put on his street clothes, and go to the gate and punch out, and he was at liberty to go wherever he pleased. He was on his own time and could go where he pleased. He was not required to take any particular conveyance away from there; neither was he required to take any particular road. He had a right to take the street car, or go down the road, or go down the cinder path on the street car track, or go through the road that runs south in the lower woods on out Buford street. The matter of his going and coming was up to him; there was no instructions as to what road he should take or how he was to come and go from his work. As I have stated heretofore, they had no discretion or control over him after he punched out at the big gate. From the pumphouse, where Mr. Dinkins worked, to the big gate, where they punch out, would be something like two hundred yards."

From our inspection of the record there is no evidence contrary to that above set out, and the court, under the circumstances, should have made the finding requested by the defendant. The court made no finding of fact whatever with reference to the relation of the work to the injury, and from his finding of fact that Dinkins was killed in the course of his employment he concludes, as a matter of law, that he was killed in the course of his employment. The court should have made this finding of fact as requested, and his failure to do so was error.

[5] The fifth and sixth assignments of error will be considered together, and are as follows:

(a) "The court erred in refusing to find as a fact that 'the injury which resulted in the death of A. P. Dinkins occurred on one of the main roads leading from Beaumont, Texas, to Orange, Texas, at a point more than three-fourths of a mile west of the plant of the Magnolia Petroleum Company,' same being finding No. 4 requested by defendant."

(b) "The court erred in refusing to find as a fact that the road upon which A. P. Dinkins was injured was not the only road leading from the plant of the Magnolia Petroleum Company to the resident section of Beaumont, and that there are several other ways employed by persons who work for the Magnolia Petroleum Company in going to and coming from their work, and that the map introduced by defendant correctly shows the different roads that may be taken by the employés in going to and coming from their work, same being embodied in finding No. 10 requested by defendant."

The record reflects that Dinkins was injured at a point more than three-fourths of a mile west of the refinery, on Madison street, which was a part of the Beaumont-Orange road. The point of injury was no more in the hazard zone of the refinery than any other paved street in Beaumont.

D. W. Webster testified as follows:

"I made this map which you exhibit before me and which has already been introduced in evidence. * * * This map correctly represents the conditions of the roads out in the vicinity of the refinery. The length of those blocks between Irving avenue and Grove street is about 800 feet. From this point, which is marked 'Broken tree scene of accident,' to the refinery gate is about ¾ of a mile, and I will also state that I measured the distance myself. * * * The distance from the city limits to the scene of the accident is about 2,800 feet. I have not traveled over those streets that lead from Poplar street over to Sherman and Grant streets lately, but I have looked down them and saw they were good roads. It showed that it was a good, plain, open road. * * * Those streets that you see marked on the map 'good earth roads' are well-defined streets; that is, those I looked down are well defined. It is about one hundred and seventy-five yards from the point of the accident to Irving street. I measured that on the ground. I have also been over that portion of the street that leads from Madison avenue to the Orange road, and will also state that that is a portion of the main highway that leads from Beaumont to Orange."

C. L. Scherer testified:

"I am the city engineer of Beaumont. I have been here (in Beaumont) thirteen years. During that time the Magnolia Petroleum Company has never expended any money or anything in the way of material that I know of helping to keep up Madison avenue. Neither has the Magnolia Petroleum Company exercised any control over Madison avenue that I know anything about. They have not paid anything for the use of that street in the last twelve years that I know anything about. The shell was furnished by the county and is still being furnished by the county when any repairs are to be made out there, and the city does the work; this is the agreement between the city and the county. Yes, sir; I was living in Beaumont when Madison avenue was built. I could not tell you why they shelled Madison avenue instead of some other street out there. The county is the one that picked the street to be shelled, but the reason why I couldn't tell, unless it was to be the Orange county road. Yes, sir; that is a continuation of the Orange county road, and is the main traveled highway from Jefferson county to Orange county. * * * So far as the Magnolia Petroleum Company is concerned, they exercise no control whatever over that road that I know of. So far as I know, the Magnolia refinery has not paid anything in the way of upkeep of that road from the refinery gate to the city limits. I do believe, however, that they did furnish the oil one time to oil that road."

C. Marshall, secretary of the Magnolia Petroleum Company, testified:

"The Magnolia Petroleum Company has not expended any money whatever in improving Madison street; neither has it furnished money, material, or labor on Madison street. I think about four years ago the city, who owns and controls that end of Madison street, made a proposition that if we would furnish the oil that they would put it on the road, for it was so dusty you could hardly travel it. They put some kind of material on one end of it at that

time, but we had nothing to do with it at all. We made no charge for that oil; we merely gave it to them."

The foregoing facts are what the court based his findings of fact upon, apparently, and while the testimony is, undisputed that Madison street, where the injury occurred, is a part of the main road from Beaumont to Orange, the court refused to make a finding to that effect. It refutes the idea that Madison street was the road used exclusively by employés of the Magnolia Petroleum Company in going to and coming from their work. We are of opinion that the court erred in refusing to make this finding of fact so requested, and should have found the facts as requested.

The last assignment of error complains that the court erred in refusing to find as a matter of law that said injury was not received by said A. P. Dinkins while engaged in or about the furtherance of the affairs or business of the Magnolia Petroleum Company.

[6] Appellant requested the court to make the conclusion of law embodied in the foregoing assignment, but the court refused to so find, to which defendant excepted.

Section 5, part 2, Workmen's Compensation Law (General Laws 1917, c. 103, p. 283), provides:

"Whenever such suit is brought, the rights and liability of the parties thereto shall be determined by the provisions of this act."

Honnold on Workmen's Compensation, vol. 1, pp. 167, 346, and 358.

The appellees base their right of recovery on the Workmen's Compensation Act alone, and they must show that they are entitled to compensation within the terms of the act.

[7] To come within the term "injury received in the course of employment," it must be shown that the injury originated in the work, and, further, that it was received by the employé while engaged in or about the furtherance of the affairs of the employer. If it be conceded that the injury originated in the work, it would still be necessary, in our opinion, to show that the employé was engaged in the furtherance of his employer's business.

In the case of Hills v. Blair, 182 Mich. 20, 148 N. W. 243, it is said:

"But it is shown here that deceased left the locality and sphere of his employment at a time when work was suspended, that he was doing nothing within scope of his employment, was not under the direction or control of his employer, and went away for purposes of his own, going where and as he pleased. Though he was traveling on his employer's premises when injured, he was then 950 feet away from where any duty in the line of his employment called him, and had selected his own route. But a short distance from where he left the carhouse he could have turned by a public street onto a wagon road along which he could have gone to his home, and a safe footpath was also available to him along the right of way. The custom of employés to travel along the railroad in going to and from their work, when it is shown that there, was another and safe way which they might have taken, is not of controlling importance. At the same distance deceased was injured, from the place of employment, they would be at most licensees. In Caton v. Summerlee & M. I. & S. Co., 39 Scotch L. R. 762, it was held that the injury did not arise out of and in the course of the employment of a laborer who, at the conclusion of his day's work, was knocked down and killed by a passing engine 230 yards from where he had been working, while walking home along a private railway track ·belonging to his employer, which many of the men employed at the same place were in the habit of using in going to and from their work. The court there said: 'The deceased at the time of the accident had ceased his work, had left the place where he did it, and was on his way home. He had at the time no duty to fulfill to his master, and his master had no duty to fulfill towards him. The relation of master and servant had ended for the day, he having fulfilled his work and left the place where his work was being done.' "

In the instant case the deceased had left the locality and sphere of his employment, and was doing nothing within the scope of his employment, and was not, at the time, under the direction or control of his employer, and went away, and was three-fourths of a mile from any duty in the line of his employment, and had selected his own route. He could have gone to his home some other route, as there were several ways together there besides the paved road, or he could have gone on a street car. As the statement of facts shows, the deceased at the time of the accident had left the place of his employment, and was on his way home. He had at the time no duty to fulfill towards his employer. The relation of master and servant had ended for the day, he having fulfilled his work and left the place where his work was being done.

Under the undisputed testimony in this case, claimant has failed to show such relation of cause and effect between the accident and the duties of the party injured to his employer as will support a conclusion of law that the injury arose out of and in the course of employment. A fair interpretation of the Compensation Act can only lead to one conclusion, that is, that Mr. Dinkins was not killed in the course of his employment.

There seems to be quite a lot of stress laid by appellees on the fact that Dinkins was killed in what is termed "the hazard zone of the refinery," because the collision occurred on the road which is principally traveled by employés going to and coming from their work. The point of injury, however, was within a few hundred feet of the Port Arthur road. (See map herewith attached). This record discloses that the only

PLAT SHOWING DIFFERENT ROUTES FROM MAGNOLIA REFINERY.

DOTTED LINES SHOW DIFFERENT ROUTES.

time the Madison street road could be regarded as dangerous was in the afternoon at 5 o'clock. There was no attempt by the employer to dictate as to where Dinkins should leave, nor was there any attempt to control the manner in which he went to and from his work.

[8] After a careful consideration of all the facts in the case, reading carefully the statement of facts, and following closely the argument of counsel, we are led irresistibly to the conclusion that there was no liability in this case under the Compensation Act, and, as said by an eminent writer, "although the appellee's employment may continue for an interval after he has actually ceased working, yet there must come a time when he can no longer be said to be engaged in his employment in such a way that an accident happening to him can be said to have arisen out of and in the course of his employment." There must be a line beyond which the liability of the employer cannot continue, and the question where that line is to be drawn in each case is to be determined by the facts themselves. We believe this is such a case, and therefore this assignment is sustained.

We desire to express our appreciation for the able and exhaustive brief filed by the appellant in this case, which has, indeed, been of great assistance to the court in determining the disposition of this case.

From what we have written, it follows that this cause must necessarily be reversed, and judgment rendered for appellant.

### Additional Findings of Fact.

HIGHTOWER, C. J. The Court of Civil Appeals, at the request of the appellee makes the following findings of fact in this cause in addition to the facts set out and found in the opinion of the court, to wit:

(1) On September 30, 1917, the Magnolia Petroleum Company was a subscriber under the Employers' Liability and Workmen's Compensation Law of Texas, and on that date carried a policy of insurance under said law with the American Indemnity Company.

(2) On September 20, 1917, A. P. Dinkins was in the employ of the Magnolia Petroleum Company, and as such employé was covered by said policy of insurance against personal injuries and injuries resulting in death, if sustained in the course of his employment with the Magnolia Petroleum Company.

(3) That on said date, and prior thereto, the Magnolia Petroleum Company had the legal right to insure its employés under the Texas Employers' Liability Law and the American Indemnity Company had the authority to write insurance thereunder and issue policies therefor, and the policy of insurance issued by the American Indemnity Company to the Magnolia Petroleum Company, insuring its employés under said liability law, including A. P. Dinkins, was legal, valid, and in force on September 30, 1917,

(4) The average weekly wages of the said A. P. Dinkins was the sum of $28.75.

(5) Said A. P. Dinkins, deceased, left as his sole and legal beneficiaries his surviving widow, Mrs. A. P. Dinkins, and two minor children, Jack Dinkins and Emma Marie Dinkins.

(6) On September 30, 1917, the Magnolia Petroleum Company employed in its refinery at Beaumont 1,600 persons, and operated three shifts per day, to wit, from 12 at night to 8 in the morning, from 8 in the morning until 4 in the afternoon, and from 4 in the afternoon until 12 at night. A. P. Dinkins was in the shift that worked from 4 in the afternoon until 12 at night, and on that shift 300 persons were involved, 150 going off work and 150 coming on to work at about 12 o'clock at night. About 5 per cent. of the employés of the refinery came to and from their work in automobiles, and quite a number came and went on bicycles and motorcyles. All employés at the refinery were required to enter and leave the refinery at the big entrance gate, where a watchman is stationed to register the employés and let them in and out, to and from the premises. There is only one road leading to said refinery gate or entrance; this road leaves the Beaumont-Port Arthur road at Madison street, and extends along Madison street, Grove street, and Burt avenue to the refinery gate. This road is graded up and paved, and, in addition to regular taxes, the Magnolia Petroleum Company contributed both labor and material at its own expense in the construction of this paved road. This is the only road leading to the refinery which is fit or suitable for automobiles, motorcycles, and bicycles and other vehicles, and is the only road used by the employés of the Magnolia Petroleum Company at said refinery who go to and from their work in automobiles and other vehicles. Frank Ellis was on September 30, 1917, an employé of the Magnolia Petroleum Company, and was on the shift which began work at 12 o'clock that night. A. P. Dinkins had quit work for the day, registered out at the refinery gate, and was going home riding on a motorcycle to secure rest and refreshment, and was traveling on said paved road leading from the refinery gate to the Port Arthur road. Said Frank Ellis was traveling on said road in his automobile to report for work, and while said Dinkins and said Ellis were traveling on said road as aforesaid they accidentally collided, about three-fourths of a mile from the refinery gate, and said A. P. Dinkins was killed as a result of the collision.

Said paved road leading from the refinery gate to the Port Arthur road is about one mile in length, and there are no paved roads

or streets branching out or leaving this road leading to the city of Beaumont or its suburbs between the refinery gate and the Port Arthur road.

The accident in which A. P. Dinkins was injured occurred on one of the public roads of Jefferson county, and occurred about three-fourths of a mile from the Magnolia refinery, or the place where Dinkins was employed.