JOHNSON v. BEDERMAN et al.
No. 8628.

Circuit Court of Appeals, Seventh Circuit.
May 29, 1945.

Rehearing Denied June 25, 1945.

William Greene, of Chicago, Ill., Austin Y. Bryan, Jr., of Houston, Tex., and Dan P. Johnston, of Dallas, Tex. (McNamara, Greene & O'Brien, of Chicago, Ill., and Bryan & Bryan, of Houston, Tex., of counsel), for appellant.

Royal W. Irwin, of Chicago, Ill., for appellee.

Before EVANS, KERNER, and MINTON, Circuit Judges.

MINTON, Circuit Judge.

The plaintiff recovered of the defendants in a common law suit for negligence. If the Workmen's Compensation law of Texas applied to him at the time of his injury, he was not entitled to the judgment he recovered in the District Court from which this appeal is taken. If he was within the provisions of the Texas Workmen's Compensation statute, his remedy was exclusively under that act. Article 8306, Section 3, Vernon's Ann.Civ.St. Whether the Workmen's Compensation Law of Texas applied depends upon whether the injury the plaintiff received was sustained in the course of his employment. The Texas statute provides that (Article 8309, Section 1, Subdivision 4):

" * * * 'injury sustained in the course of employment', as used in this law * * * shall include all * * * injuries of every kind or character having to do with and originating in the work, business, trade, or profession of the employer received by an employee while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."

The plaintiff lived in Houston, Texas, sixteen miles from the San Jacinto Ordnance Depot which was under construction for and was owned by the United States. The defendants had a contract with the United States for the construction of certain installations in the Depot. The defendants' work was on certain specific sites, over which defendants had possession and control, inside the large enclosure of the Ordnance Depot, which consisted of a tract of land some thirty square miles enclosed by a high cyclone fence. Many other contractors with hundreds of em-

516

ployees were engaged in work within the enclosure. In addition, there were civilian and military personnel of the United States employed within the enclosure or from time to time admitted to the Depot. All were equally privileged to use the roads that were laid out within the enclosure. All the roads were under the supervision of the United States. No one was admitted to the enclosure except on the exhibition of an official badge or some other form of official recognition. Entrance was at a gate manned and controlled by the United States. The general public was not admitted, but such part of the public as was admitted, was free to use the Government-controlled roads within the enclosure for any purpose related to the right to be there.

On the day in question, the plaintiff, as was his custom, was on his way to work in a "share-the-ride" car of another person. He was employed by the defendants as a carpenter's helper at fifty cents per hour. When the car was driven up to the gate, he and his companions exhibited their official badges and were admitted in their car to the enclosure. The gate the plaintiff entered was a mile and a half from the site where the plaintiff had worked and to which he was returning. After admittance, the car in which the plaintiff was riding proceeded along the roads inside the enclosure to the defendants' time office where the plaintiff received his time card. Plaintiff was proceeding in the car from the time office to the site where he was expecting to go to work for the defendants, and was traveling along an established road to the point of intersection with another established road, when a truck negligently operated by one of defendants' employees ran into the car and inflicted the injuries for which the plaintiff sued.

The scene of the accident was at the intersection of the two established roads within the enclosure, four blocks from the site where the plaintiff had been working. The plaintiff did not know until he reached the work site and presented his time card to the foreman, whether he would work that day. If the foreman wanted the plaintiff to work, he punched the time card which showed the time plaintiff went to work, and his pay began at that time. His pay stopped when the foreman punched his card at the work site and released the plaintiff. When the plaintiff worked, he started at seven A. M. The collision occurred shortly before seven A. M.

■ It is conceded by the parties that the law of Texas applies. We look to the Texas decisions for guidance. There are many decisions, but the parties themselves have relied chiefly upon a few. The plaintiff has placed great reliance upon the case of American Indemnity Company v. Dinkins, Tex.Civ.App., 211 S.W. 949, 951. In this case the employee had left his employer's premises after his work was through, and was traveling on a motorcycle toward his home. When he was about three quarters of a mile past the entrance to his employer's premises, on a public street of Beaumont, he collided with an automobile of one of his work-bound fellow employees and was killed. In that case, the court denied that Dinkins' death was sustained "in the course of [his] employment." The court said:

"This record shows that Dinkins did not receive the injury while engaged in or about the furtherance of the affairs of the Magnolia Petroleum Company, * * * and that at the time of the injury the employer was exercising no control whatever over him; and, in addition to this, the petition shows clearly that the injury did not originate in the work. It was an injury that might happen to any person on any street, regardless of his employment. * * * it clearly appears that the spirit of the Texas law requires that the employé must be actually about the furtherance of his master's business when the casualty occurs; * * * what business of his employer was he performing? If one is proceeding to his home for needed rest and refreshment, can he be regarded as engaged in the furtherance of the affairs or business of his employer? * * * There was no relation of master and servant at the time. There was no duty on the part of anyone to see that Dinkins reached his home in safety. * * * the deceased had left the locality and sphere of his employment, and was doing nothing within the scope of his employment, and was not, at the time, under the direction or control of his employer, and went away, and was three-fourths of a mile from any duty in the line of his employment, and had selected his own route. * * * He had at the time no duty to fulfill towards his employer. The relation of master and servant had ended for the day, he having fulfiled his work and left the place where his work was being done. * * * There was no attempt by the employer to dictate as to where Dinkins should leave, nor was there any attempt to control the

manner in which he went to and from his work. * * * There must be a line beyond which the liability of the employer cannot continue, and the question where that line is to be drawn in each case is to be determined by the facts themselves. * * *"

These are the court's points of emphasis in that case. The Dinkins case is certainly ruling authority up to the time plaintiff, in the case before us, left the public highway at the entrance to the Depot. Under the authority of the Dinkins case, the defendants in this case would not have been liable to the plaintiff under the Compensation act up to the time when plaintiff entered the Depot gates. Our problem is to determine where, under the facts of the case at bar, the defendants' common law liability ceases and the plaintiff comes within the provisions of the Compensation act.

At the point where, and at the time when, the accident happened, the plaintiff did not even know whether he would work that day. Certainly he was not doing anything to further the business or work of the defendants. The defendants had not provided the road over which the plaintiff traveled. That road was furnished and controlled by the United States. True, the plaintiff was there by invitation of the United States under its contract with the defendants. So also were the hundreds of other employees of many other contractors. There were in addition the civil and military personnel of the United States and whoever else the United States authorities saw fit to admit. All had access to these roads. Certainly the defendants had no control over the plaintiff at the time of the accident. The plaintiff at that time and place was not subjected to the risks of his employment. He was subjected to the risks that the public was subjected to, that is, the part of the public that was admitted to the grounds. He was not traveling over the grounds on an exclusive way which had been furnished to him by the defendants.

The defendants rely chiefly upon Lumberman's Reciprocal Association v. Behnken, 112 Tex. 103, 246 S.W. 72, 74, 28 A. L.R 1402. In that case, Behnken was employed by the Hartburg Lumber Company in its sawmill. The mill, the company store, the company boarding house, and the company's negro quarters were all south and immediately adjacent to the right of way of the Kansas City Southern Railway Company. Between the store and the boarding house there was a crossing which led from a public highway on the north side of the railroad track to the south side and into the mill premises. The crossing was exclusively for the use of the lumber company and persons having business with the company. North of both the railroad tracks and the public highway was a string of houses owned by the lumber company and maintained by it for the use of its white employees. Behnken lived in the second of these houses east of the crossing. He had worked in the mill in the morning and had gone home for lunch, as was his custom. Returning to his work, he was killed by a train at the crossing. The court held that his death was in the course of his employment. The court said:

"The crossing in this case bore so intimate a relation to the lumber company's premises that it can hardly be treated otherwise than as a part of the premises. The lumber company had rights in and to the crossing. It seems to have had no other purpose than to further the company's business. It appears to have been used only in connection with that business, whether by employees or other persons. * * * Under these facts, it is plain that Behnken's injury had to do with, and originated in, the business of his employer, since the conditions of the employment necessarily and constantly subjected him to special danger inseparable from the regular movement over the crossing of railroad engines and cars, regardless of whether operated by his employer or by another. * * * He had reached a place provided and used only as an adjunct to that business, and was injured from a risk created by the conditions under which the business was carried on. * * *"

It will thus be apparent that liability here was dependent upon the fact that this dangerous crossing was a part of the employer's premises and the conditions of employment necessarily subjected Behnken to special danger inseparable from his work. That is not true of the case before us. In our case, the place where the accident happened was not upon the premises of the defendants or any part of the premises over which defendants had control. If Behnken had been killed upon the public highway instead of at the crossing which was an adjunct of, and considered as a part of, the lumber company's premises, the case would have been more nearly like the instant case.

Defendants have also placed some emphasis upon the case of Employers' Liability Assurance Corporation, Ltd. v. Light, Tex.Civ.App., 275 S.W. 685, 687. In that case the employer had leased a granite quarry located in a pasture field a little over a mile off of the public highway. Access to this quarry was had over a private road leading to the quarry from the public highway, the use of which the employer had by the terms of his lease of the quarry. On the day in question, Light had worked at the quarry until noon when rain prevented further work and he started to return home, riding on a truck of a fellow employee, and while on the private road between the quarry and the public highway, he slipped from the truck and was killed. In that case the court held the injury was sustained in the course of employment. The court said:

" * * * In the instant case the road on which Light was killed was in no sense a public road. It was a private passage over private property, not only necessary to the Dealers' Granite Corporation in the conduct of its business, but the only route over which such corporation could gain access to its quarry or remove granite therefrom, and the only route over which Light could, or had any right to, travel in order to reach his place of employment, or return therefrom to his home. * * *"

It will be observed that in this case the court treated this road as a part of the premises of the employer. No one except the employer and persons having business at the quarry were authorized to be upon this private road. It was wholly under the control of the employer and the sole road over which employees could travel to get to their work. This is not so in the case at bar.

Another case relied upon by the defendants is Kirby Lumber Co. v. Scurlock, 112 Tex. 115, 246 S.W. 76, 78. This case is, on its facts, more nearly related to the instant case than the others. It was also an action at law, but for wrongful death, and the court held that the action could not be maintained and that the parties must look to the Workmen's Compensation law for their remedy. In this case Scurlock was employed in a sawmill. The mill did not work on the day in question, but Scurlock spent the morning working on his sizer, and in the afternoon he worked for awhile on his velocipede which he used to ride back and forth to his home upon the tracks used by the employer to haul logs into the mill. While on his way home on this day, riding his velocipede upon the tramroad tracks, a train on the tracks overtook him, ran over him, and killed him. He was at that time about a mile and a half from the mill. The court held his death was sustained in the course of his employment. The court said:

" * * * In either event, the place where he was injured was a part of the employer's premises, intended for his use as a means of going to and from his work. In either event, the danger to which he was exposed was not shared by any one not an employee. * * *"

Thus it will be seen that this accident occurred on the premises of the employer over which the employer had exclusive control and upon which the only people exposed to danger were the employees of the mill company that owned the tramroad.

We think there is no decided case in Texas that parallels the instant case. There are elements of similarity in many of the cases, but no one element is controlling. As the court said in the Dinkins case, " * * * each case is to be determined by the facts themselves."

The beehive activity inside the enclosure at the Ordnance Depot in the case at bar presented a risk which was out of the control of the defendants so that the injury sustained by the plaintiff could not be considered a risk of the defendants' work. The injury may be said to be related to the fact that the plaintiff was employed in the enclosure, but it is not related to any work of the defendants at the time. It was the plaintiff's exposure to the general risk in the enclosure that caused his injury, and not the dangers of the defendants' work or business.

On the peculiar facts of this case, we think the injuries sustained by the plaintiff did not arise out of his employment by the defendants.

The judgment of the District Court is affirmed.