## WESTERN INDEMNITY CO. v. LEONARD.
### (No. 689.)

(Court of Civil Appeals of Texas. Beaumont.
May 26, 1921. Rehearing Denied
June 8, 1921.)

I. Master and servant ⬉348—Compensation
Act liberally construed.

To effectuate the purpose of the Workmen's Compensation Act (Vernon's Ann. Civ. St. Supp. 1918, arts. 5246—1 to 5246—91), to provide means for speedy adjustment of industrial accidents, and to insure compensation, its provisions should be liberally construed in favor of those claiming compensation.

2. Master and servant ⬉375(2)—Injury to
employé boarding train to return home held
in "course of employment," within Compensation Act.

Where a shipbuilding company operated under a contract with the federal government, on a cost plus profits basis, and the company's expenses in furnishing railroad transportation to its employés were part of the cost, and an employé, after leaving the train at the place of work and while he was on the railroad right of way, started to return to the train on seeing a signal that there would be no work that day, and was injured in jumping across a ditch between him and the train, the injury occurred in the course of the employment, within Workmen's Compensation Act, pt. 4, § 1 (Vernon's Ann. Civ. St. Supp. 1918, art. 5246—82), so as to be compensable, though he occupied the relation of passenger to the federal administration of railroads as carrier; there being an election of remedies under part 2, § 6a (article 5246—47), of the act, if the circumstances created a liability against the carrier.

[Ed Note.—For other definitions, see Words and Phrases, First and Second Series, Course of Employment.]

Appeal from District Court, Harris County; Ewing Boyd, Judge.

Proceeding by Effie V. Leonard under the Workmen's Compensation Act against the Western Indemnity Company to recover for the death of her husband, an employé of the Universal Shipbuilding Company. From a judgment of the district court, sustaining an award of the Industrial Accident Board, the Indemnity Company appeals. Affirmed, with directions.

Andrews, Streetman, Logue & Mobley, W. L. Cook, and E. J. Fountain, Jr., all of Houston, for appellant.

Atkinson & Atkinson, of Houston, for appellee.

WALKER, J. This appeal is from a judgment of one of the district courts of Harris county, sustaining an award made by the Industrial Accident Board, under the Texas Workmen's Compensation Act, allowing Mrs. Effie V. Leonard, appellee, compensation against the appellant for the death of her husband, James Leonard. On the 29th day of October, 1918, the date of his injury, James Leonard lived in the city of Houston, and was an employé of the Universal Shipbuilding Company, and had been for many months previous thereto. It was agreed:

"It is also agreed that due to the fact that the plant of the Universal Shipbuilding Company was several miles distant from the city of Houston, and also to the fact that transportation facilities to such plant were limited, and due to the lack of housing facilities, and to the fact that at the time and place there was a scarcity of skilled and experienced labor, it became necessary to provide transportation for the employés of Universal Shipbuilding Company engaged in the work of shipbuilding at its plant in question, and said transportation was in fact provided for said employés to carry them from the Southern Pacific (Grand Central) Station, in the city of Houston, to said ship building plant, and from said plant on the return trip to said station. At the time of the injuries sustained by said James Leonard, above mentioned, and for a considerable period prior thereto, the transportation of the employés to and from their work was without cost to said employés, the same being carried forward into the transportation cost paid, in addition to the daily wage became and was a part of the contract of employment between the employés, including the said James Leonard and the said Universal Shipbuilding Company. The train upon which said employés were carried to and from their work was operated on a certain fixed schedule, and was not a train exclusively for such employés, but employés of other industries were carried to and from their work thereon, and at the same charge per man. In the case, however, of the shipbuilding employés at the time of the injuries to James Leonard, and for some time prior thereto, the commutation tickets used for the purpose were furnished to its employés by the Universal Shipbuilding Company at its shipyard, said tickets being regularly issued by the Federal Railroad Administration, and being paid for to said Railroad Administration by Universal Shipbuilding Company in accordance with the arrangements theretofore made to relieve the employés of the cost of said transportation. The ships were being built by said Universal Shipbuilding Company on a basis of cost plus a percentage computed thereupon as profit, and the additional expense of transporting the men to and from their work was under authority of the Emergency Fleet Corporation, acting for the United States government, included as a part of the cost of building the ships. The trains upon which the employés in question rode, and the tracks upon which they were operated, were in no sense under the control of the Universal Shipbuilding Company, but were under the control of, and operated by, the United States Federal Administration of Railroads, and each and every employé who rode upon such train or trains thereby became a passenger and occupied the relation of passenger to the Federal Administration of Railroads as carrier."

This arrangement for the payment of the transportation, as set forth in the above

agreement, was made by the Universal Shipbuilding Company under authority given by the Emergency Fleet Corporation, and as shown by the agreement, the cost of this transportation was carried into the cost of the ships, and the shipbuilding company was allowed the same percentage of profit on the cost ·of this transportation as on the other items of expense incurred in building ships. In other words, every time James Leonard rode to and from the ship plant, he was making money for his employer. This transportation was allowed the employés of shipyards by virtue of the Macy award, and in connection with this award it was agreed:

"It is further agreed that such award was adopted by and put into effect at once by said Universal Shipbuilding Company, and that the same was effective until after November 11, 1918, and that the said James Leonard and the other employés of said Universal Shipbuilding Company would have been compelled, had it not been for such free transportation to and from such shipyards, to spend regularly more than 10 cents a day in coming to and from their work at such shipyards, and that the transportation actually furnished was furnished to the employés of said shipyards by reason of the facts above set forth, and by reason of the contract and agreement between such Universal Shipbuilding Company and its employés, and by reason of the Macy award above set forth."

The following agreement was made as to the immediate circumstances under which James Leonard was injured:

"It is further agreed that on or about said October 29, 1918, the said James Leonard boarded said train at Houston, Tex., for the purpose of proceeding to the plant of said shipbuilding company, which was several miles distant, and performing his daily duties at such plant; that in due course said train reached the plant of said shipbuilding company, and the said James Leonard, together with several hundreds of the other employés of said shipbuilding company, got off said train and started toward the entrance gate of said shipbuilding company, in order to begin the daily work; that after leaving said train, and before the reaching of said entrance gate, but while yet on the railroad right of way, the said James Leonard and other employés with and around him were notified by said shipbuilding company by means of a signal used for that purpose that no work would be performed on that day, which signal was given by reason of the fact that at that time it was raining; that the said James Leonard immediately turned around and started back to said train, and in order to board said train, in order to return to Houston, Tex., jumped across a ditch between him and said train; and that in so doing the said James Leonard received the injuries from which he subsequently died.

"It is also agreed that before said injuries above set forth the said James Leonard was a strong, healthy, able-bodied man, but that in jumping said ditch in order to get on board said train, the same James Leonard suffered a rupture of the small intestines, from which peritonitis developed, and that by reason of said injuries and said peritonitis the said James Leonard died in Houston, Tex., on or about the 9th day of November, 1918, and that the death of said James Leonard was due directly and proximately to the injuries received by him as aforesaid."

On these facts, appellant assigns error against the judgment of the court on the ground that "the deceased, James Leonard, did not sustain an injury in the course of his employment, as that term is defined" in the Texas Workmen's Compensation Act. Part 4, § 1, of this act (Vernon's Ann. Civ. St. Supp. 1918, art. 5246–82), is as follows:

"The term 'injury sustained in the course of employment,' as used in this act, shall not include:

"1. An injury caused by the act of God, unless the employé is at the time engaged in the performance of duties that subject him to a greater hazard from the act of God responsible for the injury than ordinarily applies to the general public.

"2. An injury caused by an act of a third person intended to injure the employé because of reasons personal to him and not directed against him as an employé, or because of his employment.

"3. An injury received while in a state of intoxication.

"4. An injury caused by the employé's willful intention and attempt to injure himself, or to unlawfully injure some other person, but shall include all injuries of every kind and character having to do with and originating in the work, business, trade or profession of the employer received by an employé while engaged in or about the furtherance of the affairs or business of his employer whether upon the employer's premises or elsewhere."

[1, 2] The purpose of this act is to provide a means for speedy adjustment of industrial accidents, and to insure compensation to those injured within its terms. To effectuate that purpose its provisions should be liberally construed in favor of those claiming compensation. We believe this claim for compensation comes within the meaning of the quoted section of this act. The employés of the Universal Shipbuilding Company lived in the city of Houston, and it was necessary to transport them from the city to the plant, and in addition to their daily wages these employés were entitled to this transportation. It was as much a part of the contract as the compensation for the labor performed; it being agreed that—

"In addition to the daily wages [the transportation] became and was a part of the contract of employment between the employés, including the said James Leonard and the said Universal Shipbuilding Company."

Leonard's employer selected the means of such transportation, bought the ticket, and delivered it to him. While neither the train nor the track were under the control of the employer, it was the means—we might say

agent—of the employer in transporting its employés from their homes to their place of work. This transportation was "incidental to" Leonard's employment—was a part of the contract, and in fact a part of his compensation. It was said in Donovan's Case, 217 Mass. 76, 78, 104 N. E. 431, Ann. Cas. 1915C, 778, 779:

"The finding of the Industrial Accident Board that Donovan's transportation was 'incidental to his employment' fairly means, in the connection in which it was used, that it was one of the incidents of his employment, that it was an accessory, collateral, or subsidiary part of his contract of employment, something added to the principal part of that contract as a minor, but none the less a real feature or detail of the contract."

Leonard was on his way to his work, traveling in the usual way over the route selected by his employer, and as directed by his employer. While not on his employer's premises, he was in obedience to the orders of his employer, and was injured in the course of his obedience to such orders. The duties of his employment did not end at the gates of the plant, for the employer had contracted to carry him back to the city, and the cost of such transportation was not an overhead expense, to be taken care of in the price charged for the finished product, but was itself a direct source of revenue and profit. It seems to us that the rule announced in Donovan's Case, supra, is applicable to the facts of this case, to wit:

"There have been several decisions in England as to when and how far an employé can be said to have been in the employ of his master, while traveling to and from his work in a vehicle, or means of conveyance provided by the latter, and how far injuries received in such a conveyance can be said to have arisen out of and in the course of the employment. Many of these decisions have been cited and discussed by Professor Bohlen in 25 Harvard L. Review, 401 et seq. From his discussion and the cases referred to by him, and from the later decisions of the English courts, the rule has been established, as we consider in accordance with sound reason, that the employer's liability in such cases depends upon whether the conveyance has been provided by him, after the real beginning of the employment, in compliance with one of the implied or express terms of the contract of employment, for the mere use of the employés, and is one which the employés are required, or as a matter of right are permitted, to use by virtue of that contract."

Peculiarly so in this case, because of the profit and advantage accruing to the employer through such transportation. We conclude that Leonard's injury did originate in his work, and was received in the course of his employment, and, at the time of receiving such injury, that he was engaged in the furtherance of his master's business. The fact that he did not work that day, and that ap-

pellant received no premium for his services on that day, are not controlling. Leonard was at the place of his employment, under the terms of his contract. Being there under these circumstances, the relation of employer and employé existed, within the meaning of the Workmen's Compensation Act. Appellant did not contract with the shipbuilding company to pay compensation to employés only on the days they worked, but "while engaged in or about the furtherance of the affairs or business of their employer."

In support of its assignment, appellant cites the Dinkins Case, 211 S. W. 949, an opinion by this court, in which writ of error was denied by the Supreme Court, and Rausch v. Standard Shipbuilding Corporation, 111 Misc. Rep. 450, 181 N. Y. Supp. 513. The Dinkins Case is so different from this case on its facts that we do not consider it in point. The Rausch Case is somewhat similar on its facts, but it does not appear from the statement of the case that the defendant was receiving a profit on the cost of transportation; also it appeared from the statement of the case that the transportation "in no wise figured in the pay or wages of the plaintiff's intestate." Here, as we have seen, it was expressly agreed that the cost of this transportation was "a part of the contract of employment." As appears from the agreed statement of facts, the trains upon which James Leonard rode, and the tracks on which these trains were operated, were not under the control of the Universal Shipbuilding Company, but were under the control of and operated by the United States Federal Administration of Railroads, and Leonard, while riding on such train, was a passenger and occupied the relation of passenger to the Federal Administration of Railroads, as carrier. We do not believe that this fact took Leonard from under the protection of the Workmen's Compensation Act. Had he been injured under circumstances creating a liability against the Railroad Administration, the appellee would have had an election of remedies. It would not have defeated the right to compensation. Workmen's Compensation Act, part 2, § 6a (article 5246—47).

Appellant's fourth assignment of error is:

"The trial court erred, to the prejudice of the plaintiff in error, in decreeing any amount of compensation to the defendants beyond that which had matured upon the basis of weekly payments to the date of judgment."

The proposition is:

"Since the accrued compensation at the time of the trial amounted to $990, the decreeing of $1,027.62, as due on the date of the judgment, was error."

We find the following notation in pencil writing under this proposition:

"This question will be withdrawn by consent of counsel, as per agreement on trial of the case."

The judgment of the trial court in decreeing successive executions for the collection of the compensation as it matures is sustained by U. S. Fidelity & Guaranty Co. v. Davis, 212 S. W. 242.

Believing that this case was correctly tried, the judgment of the trial court is affirmed. This order is made, however, without prejudice to the rights of appellant to reopen the case, should conditions arise which, under the Workmen's Compensation Act, would terminate appellee's right to receive compensation. In making this order, it is our purpose to decree that the interest of appellees in this recovery shall be held by them under the restrictions and privileges provided by the Workmen's Compensation Act.

⬠For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes