TEXAS EMPLOYERS' INS. ASS'N v.
BEACH et al.
No. 2669.

Court of Civil Appeals of Texas. Eastland.
June 25, 1948.

Rehearing Denied July 28, 1948.

McMahon, Springer & Smart, of Abi-·lene, for appellant.

Marshall, King & Rodgers, of Graham, for appellees.

GRISSOM, Chief Justice.

Jesse P. Beach was killed while employed by M. & S. Drilling Company. The employer carried workmen's compensation insurance with Texas Employers' Insurance Association. He was killed in an automobile accident on a public highway between Breckenridge and Graham while he was driving his own automobile and returning to his home from his work in Throckmorton County and transporting three other members of his drilling crew. Judgment, based upon a jury verdict, was rendered for Beach's wife and son against said insurance carrier and it has appealed.

Special issues numbers 1, 2 and 2–A, the court's instructions in connection therewith, and the jury's answers thereto were as follows:

"Special Issue No. 1. Were the fatal injuries, if any, sustained by Jesse P. Beach on February 15, 1947, sustained by him in the course of his employment for the M. & S. Drilling Company? Answer 'yes' or 'no.' Answer Yes.

"In this connection, you are instructed that the term 'injury in course of employment,' as used in this charge, shall include all the injuries of every kind and character, having to do with and originating in the work, business, trade or profession of the employer, received by the employee while

engaged in or about the furtherance of the affairs or business of his employer, whether upon the employers premises or elsewhere.

"An injury or death resulting therefrom is not sustained in the course of employment, as that term is defined herein, where same occurs on the public highway while the employee is returning to his home from his place of employment, and at a place removed from the premises of the employer and from the means of ingress and egress to and from said premises, and from a hazard to which the public generally is exposed, and under circumstances in which the employee is not on a mission for his employer, and where the employer does not provide or furnish the means of transportation, has no control over same, and where the employee is not paid compensation for time consumed in going to and from the place of work.

"Special Issue No. 2. Was it the sole purpose or intention of Jesse P. Beach in making the trip in question, on the occasion of, and at the time of his sustaining the said fatal injuries, to take either himself or the three other employees to their homes in Graham? Answer 'yes' or 'no.' Answer: No.

"Special Issue No. 2-A. Do you find from a preponderance of the evidence that the employer, M. & S. Drilling Company, was compensating the deceased, Jesse P. Beach, at the time of his fatal injury for the use of his automobile, if it was used, in transporting the M. & S. Drilling Company's employees to and from the location of the Blackwell Oil & Gas Company's well in Throckmorton County, Texas? Answer 'yes' or 'no.' Answer: Yes."

Appellant timely filed a motion for an instructed verdict because the undisputed evidence showed that (1) Beach was injured on a public highway far removed from his employer's premises, or means of ingress or egress thereto, and by a hazard to which the traveling public generally was exposed; (2) that deceased was returning to his home from his place of work in his own automobile under a contract of employment wherein his employer did not pay compensation for the use of deceased's au-

tomobile in going to or returning from work; the employer did not provide fuel or repairs for the automobile and deceased did not receive any pay for the time spent by him in going to and returning from his work; (3) that deceased was not then on a mission for his employer; (4) that at said time deceased's employer had no control, or right of control, over the automobile in which deceased was riding, and (5) because there is no evidence esablishing, or tending to establish, the contract of employment alleged by plaintiffs, particularly in regard to an alleged requirement of the employer that deceased furnish his car for his own transportation and the transportation of the other three members of his crew to and from their homes to the well; (6) because the undisputed evidence showed deceased was not in the course of his employment; (7) because there was no evidence deceased was within the course of his employment when injured; (8) because there was no evidence deceased sustained an injury which arose out of his employment, and (9) because there was no evidence deceased sustained an injury which originated in the work of deceased under his employment with M. & S. Drilling Company.

Said motion was overruled. After return of a verdict for plaintiff, appellant presented a motion for judgment non obstante veredicto which included the specific reasons stated in its motion for an instructed verdict, said motion was likewise overruled and judgment rendered for claimants.

Appellant's points present the contentions, among others, that the judgment must be reversed and judgment rendered for it because the court erred in overruling appellant's motions for an instructed verdict and for judgment notwithstanding the verdict. It contends the evidence is insufficient to support a finding deceased was killed in the course of his employment and that the record affirmatively shows deceased was not acting in the course of his employment when he was killed.

Relative to the contention that Beach was not acting within the course of his employment when injured, claimants' pleadings and evidence show that the M.

& S. Drilling Company was engaged in drilling an oil well in Throckmorton County; that its office was in Graham and Beach lived there. That on the day Beach was fatally injured, he had been working on a rig belonging to said company in Throckmorton County, approximately 50 miles from Graham; that Beach had worked on the daylight shift, reporting to work at the well at 7:30 in the morning and stopping work there at 3:30 in the afternoon. On that day he had driven his own automobile and had transported the three other employees on his tower, to the well in the morning and was taking them home after the close of the day's work when his automobile struck a highway post while going around a curve, the car turned over and Beach and another were fatally injured. Beach, and the others of his tower, left the well after 3:30 in the afternoon when another shift or tower took their places, and on their way back to their homes in Graham, they stopped at Breckenridge. They ate at Breckenridge and spent approximately two hours there. They left Breckenridge about 6:45 P.M. The accident occurred about ten miles from Breckenridge on the Graham road at approximately 7:00 P.M.

Claimants' alleged Beach was in the course of his employment because his employer required, according to custom, that he furnish his automobile every fourth day to transport himself and other members of his tower from Graham to the well and back home; that he carry the employer's water can and have his automobile on the well location for the purpose of conveying information, messages and material to and from the rig. Claimants' alleged deceased was within the course of his employment because he was paid for furnishing transportation for himself and the other members of his crew on every fourth day by reason of the fact that his employer took the cost of operating said employee's automobile into consideration in determining the amount of money Beach would be paid for each hour he worked at the well.

Mr. Montfort, one of the owners of the M. & S. Drilling Company, who made the employment contract with Mr. Beach, testified that said company purchased a rig from a Mr. Lancaster in 1946; that deceased was then employed on said rig. Mr. Montfort was not a party to the suit. He was appellees' witness. He was the only witness who testified as to the employment contract between Beach and the M. & S. Drilling Company. With reference to the contract of employment made with Mr. Beach, Mr. Montfort testified:

"Q. All right, Mr. Montfort, will you tell us what your contract of employment with Mr. Beach was? A. Judge, as far as any contract is concerned, we did not have any definite contract. It was merely a statement as to wages, the wages that we would pay and the hours they worked, so many hours a day.

"Q. State what you said to him about pursuing his work in the usual and customary manner, if anything? A. They asked if the wages we would pay, what that would be, and if there would be any changes relative to the towers they worked, and we told them that we would make one change, and that was that Mr. Lancaster had been paying double time on Sunday, and that we would discontinue paying double time on Sundays, and we told them that we would pay ten cents more an hour than Mr. Lancaster had been paying them to offset the double time. There would be no changes in the number of hours they worked on tower, but we would pay them straight time and pay them ten cents more an hour to offset the double time Mr. Lancaster had been paying them for Sundays.

"Q. And did you tell them their duties would be the usual and customary labors in the oil fields? A. Yes, the usual drillers' and roughnecks' labors around the rig.

"Q. And under that statement of affairs as you have outlined, the deceased, Jesse P. Beach, continued to work for you up until the time of his death, did he not? A. Yes, sir.

\* \* \* \* \* \*

"Q. Then it is your testimony that it took twelve men, four men to the crew, each crew working 8 hours per day, to drill that well. Is that correct? A. Yes, sir.

"Q. Did all of those men live in Graham, Mr. Montfort? A. Judge, I really don't know.

"Q. Most of them did, didn't they? A. Yes.

"Q. That was where you maintained your office and your place of business, in Graham, Texas. Is that right? A. That's right.

"Q. And one member of your firm lived there, didn't he, Mr. Stephens, commonly known as "Stubby" Stephens. Is that right? A. That's right.

"Q. Mr. Montfort, what wages did Mr. Beach draw in the course of his employment with you? A. He drew $1.10 per hour for 40 hours and time and a half overtime after that.

"Q. Now, averaging that up for the week, that would be about $61.00 or $62.00 per week, would it not? A. Well, I would think so, something like that, without figuring it up.

\* \* \* \* \* \*

"Q. And I believe you testified that his duties with you after you took over was that of floor man. Is that correct? A. That's right.

"Q. And he worked under you according to the usual and customary rules that prevailed in the oil fields in Young and Stephens and adjoining counties? A. Yes, sir."

Mr. Montfort testified that the well on which Mr. Beach was working at the time he was injured was located in a fairly thickly settled farming community near a paved public highway. That there was no town "right near," no rooming house, no hotel, and that the closest place to eat was Woodson, three mile away. That there were no living quarters at the rig. He further testified:

"Q. You didn't, of course, undertake to furnish your employees any place to stay or any place to eat or anything like that, did you? A. No, sir.

"Q. And there were no such facilities there near the rig for that purpose? A. No, sir.

"Q. Then, necessarily, they had to come and go from wherever their homes were, because there were no facilities for them living in that vicinity? A. As far as I was concerned, Judge, I had nothing to do with that part of it.

"Q. You had nothing to do with that? A. No, I had nothing to do with where they stayed.

"Q. Now, the oil fields in this vicinity include the oil fields in Young, Stephens, Throckmorton, Jack and Archer Counties, do they not? A. Yes, it is generally considered that.

"Q. And from the center of your operations in Graham in Young County, you usually and customarily use men living in and around Graham for that purpose, do you not? A. When it is convenient, yes.

"Q. You drill wells from within a few miles from Graham up to as much as a hundred miles out of Graham, wherever you happen to be operating, do you not? A. Yes.

"Q. And in doing that your men come and go from Graham to where you are drilling the well each day, do they not? A. Most of them, yes.

\* \* \* \* \* \*

"Q. And the other members of Mr. Stidham's crew, including Mr. Beach, were working for Lancaster at the time you took it over. Is that right? A. That's right.

"Q. Did you have any discussion with the men, the members of the crew, in relation to the hours of work and the rate of pay that they were to receive after you took them over as your employees? A. We did, yes.

"Q. With whom did you have those discussions? A. Chiefly, the drillers.

"Q. And I assume that whatever you told the driller that he in turn expressed it to the other men, the members of his crew. Is that right? A. That's right.

"Q. Did you yourself talk to the drillers, and if you did not, do you know who did talk to the drillers as to the rate of pay the men would receive and would be paid? A. I talked to them myself.

"Q. As I understand Mr. Stidham was the driller, or foreman, of the crew Mr. Beach was a member of. Is that right? A. That's right.

"Q. What was your discussion with Mr. Stidham, as foreman, as to the wages Mr. Beach would receive for his work with you? A. I told Mr. Stidham we would discontinue paying double time.

"Q. What was that for? A. For Sundays.

"Q. All right, go ahead. A. And that we would offset the double time that Mr. Lancaster had been paying for Sunday by increasing their hourly wage ten cents an hour up to 40 hours per week, and time and a half for overtime after 40 hours.

"Q. Now, you increased Mr. Beach's wages ten cents an hour and put them on straight time? A. Yes, we increased all of them.

"Q. Now, as an actual fact, it amounted to about fifteen cents an hour up to 40 hours per week, the increase in wages, including time and a half for overtime. Is that right? A. That's right.

"Q. Now, what authorization or what instructions or discussion did you have with Mr. Stidham, or any member of that crew, that is, the crew that Mr. Beach was connected with at the time of his death with reference to any member of that crew before being employed or permitted to go to work for the M. & S. Drilling Company being required to own an automobile? A. I did not make any such requirement.

"Q. What instructions, if any, did you give Mr. Stidham or to Mr. Beach, or any member of their crew, with respect to the matter of having to provide their individually owned automobile every fourth day for use in transporting the men to and from the location where you were drilling? A. None whatever. I have never given any such instructions.

\* \* \* \* \* \*

"Q. What instructions did you give Mr. Stidham, or any member of the crew, with respect to being required to have their own automobile at the location for any purpose? A. I have never required any of them to have their own automobile at the location.

"Q. What instructions, if any, did you give Mr. Stidham, or any member of that crew, with respect to the amount they were to be paid for the use of their individual automobile in going to or coming from work? A. I have never given anyone any instructions as to payment for the use of their automobile, except Mr. Henry.

"Q. Who is Mr. Henry? A. He was the driller that was working at that time and at the time we bought the rig. He worked until December and Mr. Hughes took his place.

"Q. The question I asked you, was what discussion or instructions did you give Mr. Stidham, or any other member of Mr. Stidham's crew, at the time you took over this rig from Mr. Lancaster, as to the amount of money any member of that crew would be paid in connection with the use of his individual automobile at the rig, in going to or coming from work? A. I never gave any such instructions that they would be paid for their individual automobile for that purpose.

"Q. Now, how were the wages of the crew to be paid? A. It was figured on the basis of $1.10 per hour for the first 40 hours and time and a half over time actually worked by them on the rig.

"Q. Now, the time they started to go to the rig and the time coming from their work, was that entered into in the discussion as to their wages? A. No, that was never mentioned.

"Q. Did you pay them at that place, or at any other place, for coming to and going from their work? A. No, sir.

"Q. Did any of them ever demand it? A. No, sir.

"Q. Now, Mr. Montfort, what control, if any, did you have over Mr. Stidham, or any member of that crew, as to the manner and way they came to the rig or the manner and way in which they left the rig? \* \* \* A. I didn't have any control over them. All I was interested or concerned with was that they would be out there and put in eight hours a day at the rig.

"Q. Did you have anything to say or do as to the method they came to the rig? A. No, sir.

"Q. Did you have anything to say or do as to the method they left the rig? A. No, sir.

"Q. Did you have anything to say or do about them as to where they went after they left the rig? A. No, sir.

"Q. Did you have anything to say or do about them which way they went when they went to the rig? A. No, sir.

"Q. Did you have anything to say or do about them which way they went when they left the rig? A. No, sir.

"Q. Did you have anything to say as to the speed which their automobile should be operated when they left or came to the rig? A. No, sir. It was their own car. I didn't have anything to do with that.

"Q. When they left the rig, did you have anything to say as to whether or not they should complete their journey home in the day time or night time? A. No, sir.

"Q. Was Mr. Stidham paid anything for the use of his individual automobile that you know anything about? A. He was not.

"Q. Was Mr. Beach ever paid anything that you know anything about? A. No, sir.

"Q. Was Mr. Montgomery ever paid anything that you know anything about? A. No, sir.

"Q. Or Mr. Robertson? A. No, sir.

"Q. Did you have at that time crew members on any other towers when you were drilling that Blackwell well who did not own a car? A. Yes, several of them.

"Q. Do you know what arrangements were made with reference to transportation of the members of the crew who did not have their own automobile? A. That was strictly up to the man who did not own a car to make an agreement between themselves as to their transportation.

"Q. Do you know, as a matter of fact, that some such agreements were made? A. Yes, sir.

"Q. Do you know whether or not in connection with those agreements some consideration, in cash, was paid the owner of an automobile for transportation back and forth from the rig by the crew member who did not have an automobile? A. Yes, sir.

"Q. Has the M. & S. Drilling Company ever reimbursed the member who did not have his own car for the money he had spent in being transported to and from his work for you? A. No, sir.

"Q. Have you ever had any of them demand that you pay them back for money they had spent in being transported to and from their work with your firm? A. No, sir.

"Q. Did you ever undertake to determine the place of residence of any member of any crew working on that well in Throckmorton County? A. I did not.

"Q. Did they have to live in Graham as a condition to work on that well? A. No, sir.

"Q. As far as you were concerned they might have lived any place? A. Yes, sir.

"Q. They could have lived here in Breckenridge as far as you were concerned? A. Yes, sir.

"Q. Or they could have lived in Ivan as far as you were concerned? A. Yes, sir.

"Q. All you were interested in was their getting to the rig and putting in their eight hours per day. Is that right? A. That's right.

"Q. And it was no concern of yours how they got there? A. No, sir.

"Q. As I understand, all you required of them was for them to get there, and how they got there was up to them? A. Yes, sir."

Mr. Montfort testified that it cost about 7½ cents a mile to operate an automobile; that he knew that Mr. Beach lived in Graham when he hired him; that, by way of Breckenridge, from Graham to the well was a distance of about 50 miles; that it would cost Mr. Beach about $7.50 a day to operate his car.

He further testified:

"Q. And if a man used his car every fourth day, you obtained the services of that man and his automobile in going to and coming from the location for working for you eight hours? A. Did you say I obtained his services?

"Q. That's right. You knew when you made this wage contract that it might be necessary for him to spend seven dollars

and a half every fourth day to make those trips in going to and coming from his work, and isn't it a fact that you took that into consideration when you figured up their wage scale? A. No, that didn't enter into the question at all. We were working within ten miles of Graham—

"Q. Well, you did take that into consideration, didn't you, Mr. Montfort?

"Mr. McMahon: Just a minute. We want him to finish his answer, if the court please. Let him finish his answer.

"Q. Is there anything else you want to say about that, Mr. Montfort? A. As I said, we were within ten miles of Graham when that wage scale was set.

"Q. Well, you knew at that time that you had this whole oil field to work in, didn't you, and you knew that you might be called upon to drill a well as far as a hundred miles from Graham, didn't you? A. No, I didn't know that at that time.

"Q. Well, you had reason to believe, as a drilling contractor, in that vicinity that you might be called upon to do that, didn't you? A. Yes, there was a possibility that we would get farther away.

"Q. Then it is not your testimony to the jury that you didn't in some little way take into consideration that those men would have to spend seven dollars and a half a day in order to hold their job? A. Not every fourth day. I also considered when they were working within four miles of Graham that they wouldn't have to spend that much.

"Q. But when you made that contract back there and took over that rig, you had that in mind, didn't you? A. I did not.

"Q. Isn't it a fact that when you talked about the wage rate, that the question of owning an automobile came up? A. No, but that is very common talk now.

"Q. That's right, but isn't it a fact, Mr. Montfort, that you expected one of those men to use his car in going to and coming from his work, and also using his car in going to the supply houses and getting materials, and in going to the ice house with the water can and getting ice and water to take out on the job? Isn't that a fact? A. We did not insist on that, no.

"Q. But didn't you intend for them to do that, and didn't they do that? A. I never instructed any of them to do that.

\* \* \* \* \* \*

"Q. Isn't it a fact that if that rig had broke down and you were a hundred miles from there, or at your home which you testified was 90 miles from there, and if one of these men hadn't had their own car there to go and phone you or go get some repairs where it was necessary to start that rig up again, that you would have fired him the following day? A. I don't think I would have.

"Q. Did you ever have one of those rigs to break down? A. Yes, I have had a rig to break down.

"Q. Did you ever have one break down and it wasn't necessary to notify you to get it running again? A. Yes, I have had them break down and they didn't notify me to get it running again.

"Q. And these men always went to town after supplies in their own car, didn't they? A. No, not always.

"Q. Well, sometimes they did, didn't they? \* \* \*

"Q. Isn't that true, Mr. Montfort, that they sometimes make special trips into town for supplies? A. I don't ever remember any particular time they made a special trip into town after supplies.

"Q. Do you ever remember them going to the phone and calling for you? A. They called me one time on that particular well, I believe.

"Q. Where did they go to call you on that occasion? A. At a little store about two hundred yards from the well.

"Q. Did you know they were using their own cars even to haul gasoline from the rig to where the pump was that they were using to pump water for this well? A. No, my truck delivered the gasoline.

"Q. I asked you if it isn't a fact that they used their own car almost daily to haul the gasoline from the location down to where the pump was that pumped the water they used on that rig? A. They might have, but I didn't know it if they did.

"Q. Didn't Mr. Stidham tell you he did that? A. He might have, but I don't remember.

"Q. Didn't you see them do that one day when you were there? A. No, sir.

"Q. You never did? A. If they needed gasoline, ordinarily I hauled it myself. Ordinarily, I kept it at the pump.

"Q. Isn't it a further fact that you furnished them a can to haul their drinking water in? A. I did not.

"Q. Did you furnish them ice? A. Yes, sir.

"Q. Did you allow them to go get the ice and haul it to the location? A. They usually did, yes.

"Q. That was customary? A. Yes.

"Q. Now, that drinking water was there for your benefit as well as anybody else, wasn't it? A. It was customary to have drinking water around the drilling rig, yes.

"Q. It was there for you or anybody else working around the rig, was it not? Isn't that right, Mr. Montfort? A. That's right.

"Q. And that was customary and usual. Isn't that right? A. That's right.

"Q. Do you know whether or not that can they used to haul drinking water came to you when you bought that rig from Lancaster? A. I don't know. Several of the men we had out there used their own cans to haul water.

"Q. Which of the men gave you that information? A. I don't exactly remember.

"Q. Well, they did have a common water can that they brought their water in and when they would leave that day they took it and brought it back for the next man to use the next morning, didn't they? A. It was the usual thing that they carried the can back that they brought out that day.

"Q. Did you know that they found the can in Mr. Beach's car after he was killed? A. Yes, sir.

"Q. Then he brought the water out there that day, and it was there for your convenience, if you had been there? Isn't that true, Mr. Montfort? A. Well, I am sure he brought it out that day, but I don't believe I was there that day.

"Q. Well, it was there for you if you had been there and any other of the employees also had access to the water, did they not? A. Ordinarily, yes.

"Q. And also, isn't it a fact, Mr. Montfort, if a man got hurt or anything happened to him on that rig, that they had instructions to convey that man to a hospital in their car that stood by there? A. I never gave them any instructions on carrying a man to the hospital.

"Q. Well, they have had those things occur on a rig, haven't they, where they had a man hurt and they had to carry him to a hospital? A. Yes, I have done that myself.

"Q. Were you ever a driller? A. I was a tool dresser.

"Q. Well, that was usually and customarily your duty wasn't it, to carry a man to the hospital when he was hurt? A. Usually, out of sympathy for your fellow worker, yes.

"Q. Did you ever take your own car out on the job? A. Yes, sir.

"Q. Now, when you took your car out, was your wife at liberty to come and take the car away from the rig which was standing by? A. Yes, at any time she wanted it, she got it.

"Q. Did you ever go to the rig when there was not a car standing by that belonged to some member of the crew? A. Yes, sir.

"Q. When was that? A. I don't remember. It was along in the fall of 1946. That was entirely up to them. I didn't require any car to be there. If they didn't have a car there, there was no objection to it. I didn't care if they walked out there, so long as they got there to make their tower.

"Q. You didn't want them to walk from Graham out there, did you? A. Well, if they could get there that way.

"Q. Is it your testimony, Mr. Montfort, that it is worth seven dollars and a half a day to drive a car from Graham to the location where they were drilling this well in Throckmorton County, and have it stand by there for possible emergencies, for such purposes as you have detailed, that you didn't take that into consideration in your discussion in making up the wage scale.

Is that your testimony? A. I did not take that into consideration, no.

"Q. That was disregarded? A. There was no question that came up about that when the wage scale was made up. It was made up and accepted as a standard wage scale.

"Q. Did you take into consideration they had to do all of these things when you set the wage scale? A. No, sir. To be frank, I set the wage scale in order to get the men to work.

"Q. Well, you must have taken into consideration that it would cost a man $7.50 every fourth day to come and go from his work? Didn't you look into the future and take those things into consideration? A. No, I just sat down and figured that it took so much for a man to live, but for his car I did not take that into consideration.

"Q. But in the back of your head, you didn't figure he owed you $7.50, did he? A. No, he didn't owe me anything.

* * * * * *

"Q. Mr. Montfort, what was the consideration when the M. & S. Drilliing Company took over this crew and raised their straight time ten cents an hour for the first 40 hours, and which resulted in an increase of about 15 cents per hour for everything over and above 40 hours? What did the M. & S. Drilling Company take into consideration when you did that? A. We figured that we would pay them about 40 percent more per week.

"Q. Was there any other consideration in excess of that ? A. No, sir.

* * * * * *

"Q. Was your rate of pay any different when you were drilling this well in Throckmorton County than it was when you were drilling ten miles south of Graham? A. It was not.

"Q. You were paying them the same rate of pay per hour for working ten miles south of Graham as you did in Throckmorton County. Is that right? A. That's right.

"Q. Was your wage rate the average wage rate in the oil fields in that vicinity? A. At that time it was a little above the average for that type of work. Since then we have had to raise it."

Appellee introduced evidence to the effect that it was the custom in the vicinity for one member of the crew to furnish transportation to and from the well to his crew every fourth day and take drinking water to the well; that if the rig broke down, the member of the crew furnishing his automobile that day usually went to the nearest telephone and got a welder to come out, if needed. That it was customary when a break down occurred to contact the operator as soon as possible; that it was not customary for drillers to refer in their contracts to the use of a car on the job by an employee; that it is customary for drillers to make up the wage scale so that an employee can make enough on the rig to make a living and "what they spend on the car."

Mr. Henry testified as to the custom as follows:

"Q. Tell the jury whether or not you take that into consideration in fixing the wage scale? A. Yes, we have to get enough money out of the use of the car on the rig. I have known some drillers who won't hire a man if he doesn't have a car.

"Q. Tell the jury whether or not you take all of that into consideration, the distance a man has to travel, and the use of his car every fourth day, in fixing the rate of wages? A. Yes, we have to consider that.

"Q. In other words, you just don't make a contribution of your car every fourth day? A. No, we can't afford to do that.

"Q. That is paid out of the money you receive from the contractor? A. Yes, sir.

* * * * * *

"Q. How many contracts have you ever had where you were paid for your time in going to and coming home from the well you were drilling? A. Well, we figured our wages by the day. Sometimes we would get it one way and sometimes another.

"Q. You work by the hour on a location, don't you? A. Well, they call it by the hour, but we call it by the day.

"Q. What is an eight-hour tower? A. That is where it takes three crews to make

a full day, 24 hours. Eight hours to the crew.

"Q. It used to be 12 hours, didn't it? A. Yes, I have worked 12 hours.

"Q. And now it is 8 hours? A. Yes, sir.

"Q. You work for so much an hour as a driller, don't you? A. Yes, they figure my rate by the hour.

"Q. What do you get per hour as a rotary driller? A. Well, they pay me from $1.58 to $1.85 in this vicinity as a rotary driller.

"Q. You work 8 hours at the location and your rate per hour is multiplied by eight in determining your wages per day. Is that right? A. Yes, where we work eight hours.

"Q. At the well? A. Yes, sir.

"Q. Is there anything out of that that goes to make up your time in coming from and going to your home? A. Well, I haven't worked on any particular job like that but sometimes when a job is farther away they usually pay a little bonus on that.

"Q. When have you been paid a bonus or extra money for going to and coming from the well location? It would not be usual and customary to be paid for your time in going to and coming from the well location, would it? A. Well, I don't know that that would be right.

"Q. Well, tell me what is right. How many contracts have you had where you were paid for your time in going to and coming from the well location? A. We were talking about custom. I haven't worked on any long drives, to tell the truth.

"Q. Well, have you ever worked on a job where you were paid any money per hour for the time consumed or used by you in going from your home to the well location or returning to your home from the well location? A. No, sir.

"Q. Well, is it customary to be paid for it? A. No, it is not customary to be paid for it.

"Q. Then, if that is not customary, a tool pusher or driller, whenever he takes a contract, he figures when he takes the job on a well that he is getting enough money from his rate per hour, for his time spent at the well location, where he will be able to pay his expenses in getting to and from the well location. Is that right? A. That's right.

"Q. That is the custom? A. Yes.

"Q. Now, Mr. Henry, oil field workers, as a rule, are paid higher wages than most laborers, aren't they? Isn't that right? A. That's right, since I have been in the field.

"Q. And particularly in skilled lines, such as drillers and tool pushers, they have a higher wage rate, don't they? A. Yes, they do.

"Q. They have always maintained a standard somewhat above other types of skilled labor, have they not? A. Yes, sir.

"Q. And the reason he figures he can operate and still make a living is because of the higher wage rate he can get for his work over and above what he can get for something else. Is that right. A. That's right."

The foregoing testimony is typical of the testimony in the record with reference to the existence of a custom in the oil field where Beach was working at the time he was killed for the employer to take into consideration in fixing the hourly wage the fact that an employee had on certain days to use his automobile for the purpose of transporting himself and the other members of his crew to and from the well, the custom of having an employee's automobile "stand by" at the well for use when necessary; the custom of carrying a water can to and from the well and the like. We think that the only testimony as to custom that could possibly be material in this case is that to the effect that it was the custom to take into consideration the use of an employee's automobile in fixing the amount of wages to be paid him. Here the undisputed evidence is that use of the employee's automobile was not so considered. If we assume that the evidence shows that it is customary in this oil field for an employer in determining the amount of wages to be paid an employee to take into consideration the use of the employee's automobile in the manner

Beach used his, nevertheless, such custom is not material here. It is undisputed that use of Beach's automobile was not taken into consideration in fixing his wage rate. The undisputed evidence as to the contract between Beach and his employer was that he was to be paid only for the time he worked at the well. Beach's contract of employment was clear and unambiguous. It cannot be varied or contradicted by evidence of a custom not in accord with the contract.

"The terms of a contract prevail over a trade custom or usage. Where the terms of an express contract are clear and unambiguous, they cannot be varied or contradicted by evidence of custom or usage, and this is true whether the contract is written or verbal." 25 C.J.S., Customs and Usages, § 30, p. 118.

"When not inconsistent with the contract any usage or custom may be considered, even, it seems, the custom of the particular employer. But as to a matter about which the contract is silent, a stipulation cannot be introduced by proof that its assertion is usual, such evidence tending to negative rather than to support the theory that the contract was governed by custom where the stipulation in question was omitted." 29 Tex.Jur., 17.

"But evidence of usage is not admissible to vary or contradict the terms of a plain, unambiguous contract; and in the more modern cases there has been strong judicial criticism of the tendency to resort to evidence of usage when to do so would indirectly control the true intention of the parties to contracts." 17 C.J. 495.

"Since a usage is binding only on the theory that the parties have made it a part of their contract, it will not be admitted where the evidence does not tend to show any intention on the part of the parties to contract with reference thereto and nothing can be gathered from the surrounding circumstances to lead to the conclusion that they did rely upon it." 17 C.J. 496.

In this connection, see also 25 C.J.S., Customs and Usages, § 30, pp. 120, 122; 42 Tex.Jur. 849; Malone v. Dawson, 117 Tex. 377, 386, 5 S.W.2d 965, 60 A.L.R.

665; Yoakum v. Gossett, Tex.Civ.App., 200 S.W. 582, 583; The Mount Everest, 5 Cir., 17 F.2d 478, 479; Freeman v. Morrow, Tex.Civ.App., 156 S.W. 284, 289 (writ ref.); Stovall v. Gardner, Tex.Civ. App., 103 S.W. 405, 406.

The evidence discloses nothing more than that Beach was returning home from his place of work along a public highway when his automobile turned over and injured him. He was not on the employer's premises nor near any means of egress or ingress thereto. He was not shown to be on a mission for his employer by proof that he had in his car a water can, ownership of which is not shown, which a member of said crew who furnished his automobile for a day customarily carried filled with drinking water to the well and back home at night. It cannot be said that the employer furnished transportation, or that the employee was paid for the use of his automobile or for the time used in returning home from his work. The undisputed evidence is to the contrary. The evidence is insufficient to show that at the time Beach was injured he was doing anything in furtherance of the business of his employer. He was on no mission for his employer. The evidence shows, contrary to the finding of the jury, that he was doing nothing other than returning to his home long after the close of the day's work. His employment contract did not provide that he was to be paid by his employer for his own transportation or for the transportation of his fellow employees. We think it cannot be seriously contended that Beach was within the course of his employment merely because at the time of the accident he had in his car a water can used by his crew that day for the purpose of carrying drinking water to the well which some other member of the crew would carry back to the well the following day. There was no evidence that the can belonged to the employer.

We are of the opinion that this case is within the general rule that an employee is not regarded as being within the scope of his employment while returning home from work over a public highway. The facts are less favorable to the employee

than those in United States Fidelity & Guaranty Co. v. Flanagan, 134 Tex. 374, 376, 136 S.W.2d 210, wherein it was held that an employee was not in the course of his employment when injured while returning home on his bicycle after working hours although he was required to furnish and maintain a bicycle with which to perform his duties as a delivery boy. See also Smith v. Texas Employers' Insurance Association, 129 Tex. 573, 576, 105 S.W.2d 192, 194; American Indemnity Co. v. Dinkins, Tex.Civ.App., 211 S.W. 949, 952; Lumberman's Reciprocal Association v. Behnken, 112 Tex. 103, 114, 246 S.W. 72, 28 A.L.R. 1402; Bozant v. Federal Underwriters Exchange, Tex.Civ.App., 159 S.W.2d 973 (writ.ref.); King v. Western Union Telegraph Company, Tex.Civ.App., 97 S.W.2d 493.

In Texas Employers' Insurance Association v. Inge, Tex.Sup., 208 S.W.2d 867, it was held that an employer's business was being furthered by transportation of members of a drilling crew from a well site in an employee's automobile. That decision is based upon an established exception to the general rule, to-wit, that an employee is acting in the course of his employment when he is returning from work where the transportation is furnished by the employer as a part of his contract of employment. Under his contract of employment, Inge was paid, in addition to his hourly wage, the sum of 7¢ per mile for the use of his automobile. Beach's contract of employment did not include an agreement that the transportation to and from the well was to be furnished by the employer. Beach's contract of employment excluded the idea that he was to be paid for such transportation. The undisputed evidence shows that his employment contract provided for pay only for work done by Beach at the well. In Federal Surety Company v. Ragle, Tex. Com.App., 40 S.W.2d 63, an employee was injured in the immediate vicinity of his employment by cranking an automobile preparatory to transporting employees to town from their place of work. Said decision is distinguishable from the instant case by reason of the fact that Ragle was injured in the immediate vicinity of his place of work and at a time when the day's work had not been terminated. Other cases cited by appellees may be distinguished in a similar manner.

The judgment of the trial court is reversed and judgment rendered for appellant.